**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| KANSAS HEART HOSPITAL, LLC, | ) | |
| A Kansas limited liability company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 21-1115-KHV |
| STEPHEN S. SMITH, individually, and | ) | |
| JOYCE A. HEISMEYER, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

On April 29, 2021, Kansas Heart Hospital, LLC, filed suit against Stephen S. Smith and Joyce A. Heismeyer. Plaintiff alleges violations of the Racketeer-Influenced And Corruption Organizations Act, 18 U.S.C. § 1961 et seq., and breach of fiduciary duty. This matter is before the Court on Defendants' Motion To Dismiss (Doc. #42) filed October 26, 2021. For reasons stated below, the Court overrules defendants' motion.

### Legal Standard

In ruling on defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement for relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face. Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions. See id.; United States v. Herring, 935 F.3d 1102, 1110 (10th Cir. 2019). Plaintiff bears the burden of framing its claim with enough factual matter to suggest it is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. See Twombly, 550 U.S. at 556. Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendants are liable for the alleged misconduct. Iqbal, 556 U.S. at 678. Plaintiff must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent" with defendants' liability. Id. (quoting Twombly, 550 U.S. at 557). A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Id. Similarly, where the well-pleaded facts do not permit the Court to infer more than mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief. Id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

## **Factual Background**

Plaintiff alleges as follows:

Kansas Heart Hospital, LLC is a Kansas limited liability company which conducts business in Sedgwick County, Kansas. Since 1998, the Hospital has provided specialized, comprehensive cardiovascular healthcare services to patients in Kansas. Stephen S. Smith and Joyce A. Heismeyer are residents of Kansas. On August 1, 1998, the Hospital employed Smith as Chief

Financial Officer ("CFO").  On July 7, 2011, the Hospital employed Heismeyer as Chief Operating Officer ("COO").

The Hospital is a limited liability company which at all relevant times was governed by an operating agreement entitled "FOURTH AMENDED OPERATING AGREEMENT OF KANSAS HEART HOSPITAL, LLC" ("Operating Agreement") dated May 4, 2007.  The Hospital Management Committee managed the business and affairs of the Hospital, except for those situations where the Operating Agreement expressly required approval of the members of the company.  It had "full and complete authority, power and discretion to manage and control the business and properties of the Hospital, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the [Hospital's] business."  The Operating Agreement provided that corporate officers could sign "any deeds, mortgages, bonds, contracts, or other instruments which the Management Committee authorized to be executed except in cases where the signing and extension thereof shall be expressly delegated by the Management Committee or this [Operating] Agreement."

The Operating Agreement appointed Gregory F. Duick, M.D., as Chairman of the Management Committee, but limited his duties to presiding over meetings of the Management Committee and casting a deciding vote if the committee deadlocked.  On November 1, 2010, the Management Committee employed Duick as President of the Hospital, with delegated duties of assisting and supervising the COO and CFO. It also required Duick to disclose material information to the Management Committee.  The Management Committee did not expressly authorize Duick to enter into contracts with or determine compensation for the COO or CFO without Management Committee authorization.  Under the Operating Agreement, the Management Committee reserved this authority.  Duick's employment agreement affirmed that the Hospital's

Management Committee "[was] the governing body of the Hospital and [was] responsible for the operation of the Hospital and development of policies with respect to the Hospital" and that the "Hospital, through its Management Committee, shall at all times exercise control over the affairs of the Hospital."

## I.      Key Provisions Of The Operating Agreement

Section 5.2 of the Operating Agreement provided that the Management Committee served as the Board of Directors of the Hospital and had full and complete authority, power and discretion to manage its business and affairs.  The Management Committee had the authority to elect and appoint officers as set forth in Section 5.7.  Section 5.7 provided that the Management Committee would elect a Chief Executive Officer, a Management Committee Chairman and a President of the Company.  Section 5.7 also provided that the Management Committee could elect one or more other officers or assistant officers as it from time to time deemed necessary.

Section 5.8(c) provided the duties of the Chairman of the Management Committee.  It stated that the Chairman was privileged but not required to attend all committee meetings, and along with any other officer of the company authorized by the Management Committee, could sign any deeds, mortgages, bonds, contracts or other instruments which the Management Committee had authorized to be executed, except in cases where the signing and extension thereof was expressly delegated by the Management Committee or the Operating Agreement.   Section 5.9 of the Operating Agreement provided the President's duties.  It stated that the President had the responsibilities and duties of the Chairman when the Chairman was absent, and the President was primarily responsible for maintaining the Corporate Responsibility Plan.

Section 5.10 of the Operating Agreement stated that the Chief Executive Officer was responsible for the general active management of the Hospital and all other duties assigned under

the Operating Agreement by Management Committee resolutions.  The Operating Agreement also provided that the Chief Executive Officer was accountable to the Management Committee for the effective operations of the Hospital and acted as duly authorized representative of the Management Committee in all matters in which the Management Committee did not formerly designate some other person.   Section 8.2 of the Operating Agreement stated that the Chief Executive Officer was authorized to execute contracts on behalf of the Hospital.  It also provided that the Management Committee could authorize other officers to enter into contracts in the name of or on behalf of the Hospital.

Under Section 14.9 of the Operating Agreement, Kansas law governs the validity of the agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

## II.    Bonuses

On February 9, 2015, Duick, Smith and Heismeyer met with the Management Committee. They made presentations on medical staff appointments, changes in medical staff bylaws, quality improvement plans, compliance activities, performance measures and fourth quarter financial reports.  Smith reported that Hospital accountants had performed their annual audit and made no adjustments.  He reviewed the income statement, noting that "salaries and benefits performed better than 2013, given the increases in volume."  Neither Duick, Smith nor Heismeyer requested authorization for additional compensation to themselves as corporate officers.

Before 2015, the Hospital had paid bonuses to corporate officers.  The Hospital paid Duick and Smith annual bonuses ranging from $7,000 to $16,250, and paid Heismeyer annual bonuses ranging from $3,750 to $14,000.  Two weeks after the meeting on February 9, 2015, without disclosure to or authorization from the Management Committee, Duick directed bonuses of $500,000 each to Smith and Heismeyer.  Duick, Smith and Heismeyer later disclosed the bonuses

to Hospital auditors and claimed that they were a settlement for payout of severance benefits due to a prior year change of control.  The Hospital did not change control in 2014, however, and neither Smith nor Heismeyer left employment or triggered change-of-control liability.

On April 20, 2015, Duick, Smith and Heismeyer again met with the Management Committee.  They reported on medical staff appointments, community involvement, compliance activities, performance measures and first quarter financial reports for 2015.  In reviewing the first quarter financial reports, Smith reported that "the cash balance is down due to the distribution [of profits to members] in February."  He did not disclose the $500,000 bonuses to himself or Heismeyer, which reduced the cash balance.

## III.  Deferred Compensation Plans

On July 11, 2015, Smith executed a deferred compensation agreement with Duick dated August 1, 2015, titled "Incentive Compensation Agreement, Plan I."  Duick's plan required the Hospital to pay $400,000 into an account for him on August 1, 2015 and August 1, 2016, which Duick would receive as deferred compensation on August 1, 2017.[1]  On July 17, 2015, Duick executed a deferred compensation agreement with Heismeyer dated August 1, 2015, titled "Incentive Compensation Agreement."  The agreement required payments of $75,000 into an account for Heismeyer's benefit on August 1 of 2015, 2016, 2017 and 2018, and provided that Heismeyer would receive $300,000 as deferred compensation in August of 2019 and January of 2020.  On July 20, 2015, Duick executed a deferred compensation agreement for Smith dated August 1, 2015, titled "Incentive Compensation Agreement, Plan I."  The plan required two payments of $150,000 each on August 1, 2015 and August 1, 2016.  In August of 2017, Smith

---

[1]  It is not clear from the complaint whether Duick's plan required the Hospital to pay $400,000 on each date or $400,000 total.

would receive the $300,000 as deferred compensation.

On July 20, 2015, the Management Committee met with Duick, Smith and Heismeyer.  The latter presented information on medical staff appointments, community involvement, corporate compliance, recruiting for the anesthesia department, performance measures, infection control, patient satisfaction and second quarter financial reports for 2015.  In reporting on second quarter financials, Smith reviewed the Hospital's balance sheet and income statement.  He noted "that June was a very good month" and proposed a distribution of profits to members.  Duick, Smith and Heismeyer did not disclose the three deferred compensation agreements.

On July 22, 2015, Smith executed a second deferred compensation agreement for Duick dated August 1, 2015.  Titled "Incentive Compensation Agreement, Plan II," the second agreement stated that the Hospital would make three payments into an account for Duick.  The first payment would be $133,334 on August 1, 2015, with additional payments of $133,333 on August 1, 2016 and August 1, 2017.  The agreement provided that on August 1, 2018, Duick would receive $400,000 in deferred payments.   On July 25, 2015, Duick executed a second deferred compensation agreement for Smith dated August 1, 2015.  Titled "Incentive Compensation Agreement, Plan II," the second agreement stated that the Hospital would make three payments into an account for Smith.  The first payment would be $66,668 on August 1, 2015, with additional payments of $66,666 on August 1, 2016 and August 1, 2017.  The agreement provided that in August of 2018, Smith would receive $200,000 in deferred payments.

Each deferred compensation plan stated that the "Committee shall have full power to administer this Agreement in all of its details" and defined the "committee" as Duick.  The plan also provided that the amounts payable under the plan "shall be paid exclusively from the general

assets of the [Hospital]."  Duick, Smith and Heismeyer did not disclose or seek authorization for Duick's deferred compensation agreement.

On August 1, 2015, Duick, as Trustee, executed a document entitled "KANSAS HEART HOSPITAL, LLC DEFERRED COMPENSATION TRUST I."  Smith and Heismeyer attested the trust.  On August 10, 2015, through the United States Mail or interstate wire communications, Duick opened an account with The Vanguard Group, Inc. in Valley Forge, Pennsylvania.[2]  Duick named the account the "Kansas Heart Hospital Pooled Account," and listed himself as owner and Trustee of the account.  That same day, without authority from the Management Committee, Duick transferred $665,000 of Hospital funds into the account.

On October 19, 2015, the Management Committee met with Duick, Smith and Heismeyer. The latter reported on medical staff appointments, community involvement, performance measures, patient satisfaction results and financial matters.  They did not disclose the deferred compensation agreements, the opening of the Vanguard account or the transfer of $665,000 into the account.

On December 4, 2015, again without disclosure to or authorization of the Management Committee, Duick, Smith and Heismeyer transferred an additional $325,000 of Hospital funds into the Vanguard account.  On December 8, 2015, the Management Committee met with Duick, Smith and Heismeyer to approve the proposed 2016 budget.  Smith presented the proposed budget for 2016 and reported an "additional cost" in 2015 due to "Administration Expense due to anesthesia recruitment of two physicians."  In the financial reports, Smith included the deferred compensation deposits and payments as "Administration Expense." Smith did not inform the Management

---

[2]      Plaintiff alleges that all transactions with the Vanguard Group, Inc. were made through the United States Mail or interstate wire communications.

Committee that they represented payments of $990,000 to the Vanguard trust account for the deferred compensation plans.  Also, Duick, Smith and Heismeyer did not disclose the $500,000 bonuses, the deferred compensation agreements, the Vanguard account or the transfers of $990,000 to Vanguard for their benefit.

On December 30, 2015, Duick received $781,166 in deferred compensation.  Before June 30, 2016, Vanguard mailed the quarterly and annual statements to the Hospital headquarters and principal place of business at 3601 North Webb Road in Wichita, Kansas.  At some point before June 30, 2016, Duick, Smith or Heismeyer changed the mailing address to Duick's home address.  On August 19, 2016, without disclosing the transfer to or authority from the Management Committee, Duick and Smith directed the transfer of $989,999 of Hospital funds into the Vanguard account.  In total, Duick, Smith and Heismeyer transferred $1,979,999 to Vanguard to fund their deferred compensation plans.

On July 28, 2017, as deferred compensation, Duick received $817,517 and Smith received $306,569.  On July 31, 2017, without disclosure to or authority from the Management Committee, Duick and Smith withdrew $684,086 from the Vanguard account.  By the end of 2017, Duick, Smith and Heismeyer had transferred and received $2,905,252 in deferred compensation funds.

On August 10, 2018, in deferred compensation, Duick received $407,682 and Smith received $203,841.  On December 19, 2018, Duick or Smith withdrew $39,967 from the Vanguard account.  By the end of 2018, in addition to their base salaries and standard annual bonuses, Duick, Smith and Heismeyer had received or transferred $3,516,775 in deferred compensation funds.  On April 14, 2019, Duick and Smith withdrew $41,797 from the Vanguard account.  On August 12, 2019, Duick and Smith withdrew $1,134,617 from the Vanguard account.  On August 14, 2019, in deferred compensation benefits, Smith received $282,545 and Heismeyer received $319,527.

Through the end of 2019, the Hospital had paid Duick, Smith and Heismeyer $4,118,847 in compensation benefits and transferred $1,979,999 to the Vanguard account.

## IV.  Federal Funds

In 2020, in response to COVID-19, the United States enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136; 134 Stat. 281.  The CARES Act created a "Provider Relief Fund" or "PRF" to distribute funds to healthcare providers and a "Paycheck Protection Program" or "PPP" which provided forgivable loans to small businesses. On April 3, 2020, the Hospital applied for federal funds under the CARES Act.  On April 10, 2020, the Hospital received PRF funding of $1,847,529.80.

On April 13, 2020, the Management Committee met remotely with Duick, Smith and Heismeyer.  The latter made presentations relating to medical staff appointments, the Hospital's response to COVID-19, the approval of medical staff bylaws and rules, performance activities, pending litigation and patient satisfaction.  Smith reported on the Hospital's first quarter financial status, and Duick noted that patient admission had declined 25–30 per cent.  Smith told the Management Committee that the Hospital was tentatively approved for a PPP loan of $2.6 million, which would be applied to payroll, mortgage payments and leases.  Smith also reported that the Hospital did not have 60 days of cash on hand and that its year-to-date net income was 20 per cent below budget.  The Management Committee discussed cash on hand and the uncertainty of the future given COVID-19.  Based upon its financial situation, the Hospital did not distribute profits to members.

On April 17, 2020, the Hospital received a PPP loan in the amount of $2,604,000.  On April 28, 2020, the United States Secretary of the Treasury announced that the federal government would audit any business receiving more than $2,000,000 in PPP loans.  On May 7, 2020, without

disclosure to or authorization of the Management Committee, Smith returned the $1,847,529.80 in PRF proceeds.  On May 12, 2020, without disclosure to or authorization of the Management Committee, Duick or Smith also returned the $2,604,000 in PPP loan proceeds.  On June 22, 2020, Smith reported to Hospital auditors that the Hospital did not participate in PPP.

On July 20, 2020, the Management Committee met remotely with Duick, Smith and Heismeyer.  Smith reported on second quarter finances and noted that revenue was down more than $1,500,000.  Committee members reported that due to the pandemic, medical procedures were down 20–50 per cent.  One member of the Management Committee asked about the PPP loans.  Duick reported that the Hospital had applied for a PPP loan, but he had great concerns about a possible audit and the Hospital's ability to show the required need for the loan.  The Management Committee asked for an update at the Management Committee meeting in October.  Duick, Smith, and Heismeyer knew and did not disclose that on May 7, 2020, they had returned $1,847,529.80 in PRF proceeds and that on May 12, 2020, they had returned $2,604,000 in PPP loan proceeds.

On July 27, 2020, members of the Management Committee who wanted further discussion on the PPP loan convened a special meeting.  Duick informed the Management Committee that hospital "Administration" had made the decision to return PPP funds due to the threat of an audit and concern that the Hospital would not qualify for the loan.  One Management Committee member observed that "during the April 13 meeting the case was made by Dr. Duick and Mr. Smith that COVID-19 was a threat that had already negatively affected the business of the hospital in the first quarter and the second quarter was shaping to be the same."  This member wanted to know whether Duick and Smith could know that the Hospital would not experience an outbreak that would render their services unavailable or whether the Kansas governor would shut down businesses and order physicians to cease elective surgeries.  More specifically, the member

questioned the decision by Duick and Smith to return the loan money without consulting the Management Committee.

The same member also asked Smith whether the Hospital had received PRF funds.  Smith confirmed that the Hospital did receive the funds and "that there was no requirement for prior application or attestation in order to receive the funds."  Smith reported that he and Duick decided to return the funds because the Hospital had not treated any COVID patients and "Administration" had determined that the Hospital did not qualify for the money.  The member told Smith that the return of the funds was an unauthorized management decision.   As a result, Management Committee members agreed to meet and review the Hospital's Operating Agreement and other important information.

The actions of Duick, Smith and Heismeyer caused the Hospital to lose $4,451,529.80 in CARES Act proceeds.

## V.     Employment Agreements

In 2020, Duick, Smith and Heismeyer prepared new employment agreements for Smith and Heismeyer effective February 28, 2020.  Like their old contracts, the new agreements provided for severance benefits if the Hospital terminated their employment without cause or due to a change in control.  In previous agreements, the change-in-control provision was limited to (1) a change in ownership of the Hospital, (2) a change in the Chairman or CEO or (3) a merger, consolidation, sale or similar transaction involving the Hospital.  The new agreements expanded the change-of-control provision to provide the CFO and COO could voluntarily resign and trigger change-of-control provisions in each other's contracts, meaning that mutual resignations would allow Smith and Heismeyer to collect full severance benefits.

In Smith's new employment agreement, the severance benefits equaled 2.5 times his annual base salary, 2.5 times his most recent bonus, two times the annual contributions to the Hospital retirement plan on his behalf, paid time off accrued through the date of termination and 30 days thereafter and 24 months of insurance benefits.  In Heismeyer's new employment agreement, the severance benefits equaled two times her annual base salary, two times her most recent bonus, two times the annual contributions to the Hospital retirement plan on her behalf, all accrued paid time off through termination and 30 days thereafter and 18 months of insurance benefits.  The Management Committee did not authorize Duick to execute the employment agreements and he did not disclose them to the Management Committee.

The employment agreements for Smith and Heismeyer contained the following provisions: (1) "The Employer employs the Employee in the capacity of [Chief Operating Officer or Chief Financial Officer] and to perform such other duties consistent with this executive status, as may be determined and assigned to him by the Chairman/Chief Executive Officer or the Management Committee of the Employer," (2) "Employee agrees to devote all of his time and efforts to the performance of his duties as [Chief Operating Officer or Chief Financial Officer] of the Employer and to the performance of such other duties consistent with his executive status as are assigned to him from time to time by the Chairman/Chief Executive Officer or by the Management Committee of the Employer" and (3) in the context of acquiring confidential skills and knowledge about the Hospital, "Employee will occupy a position of trust and confidence with respect to Employer's affairs."

## VI.    Resignations

On August 4, 2020, Duick or Smith withdrew the remaining $273,014.51 from the Vanguard account.  On August 5, 2020, Smith and Heismeyer simultaneously submitted their

resignations to Duick.  On August 6, 2020, Duick instructed the Hospital to pay $273,014.51 in deferred compensation to Smith.  On August 7, 2020, by wire transfer, the Hospital paid $841,552.64 in severance benefits to Smith and $674,834.30 in severance benefits to Heismeyer.  The use of wire transfer avoided the need to get the two authorized check signatures which the Operating Agreement required and limited the Hospital's ability to stop payment when it discovered the payments.

On August 9, 2020, Duick circulated a draft letter to Smith and Heismeyer and told them that it must go out the next day "after all of our meetings."  The draft letter stated that Smith and Heismeyer had resigned on August 7, 2020.  On August 10, 2020, Duick presented a letter to the Management Committee dated August 8, 2020, which misrepresented the dates of the resignations and did not mention the $1,516,386.90 in severance benefits.  By the time Duick notified the Management Committee of the resignations, the wire transfers had been completed.

On August 10, 2020, the Management Committee convened a special meeting.  Duick, Smith and Heismeyer did not attend.  The Management Committee members decided to approach Smith and Heismeyer and ask that they remain with the Hospital, or at a minimum stay through February 28, 2021 to assist in the transition to new leadership.  The Management Committee authorized a "stay bonus" of $25,000 payable February 28, 2021.

On August 26, 2020, Heismeyer took steps to remove computer files, folders and data from the Hospital computer system.  Heismeyer conducted internet searches for terms including "how to save email contacto [sic] external hard drive" and "how to save outlook to external hard drive." Heismeyer purchased 50 gigabytes of cloud storage and then attached external USB drives to the Hospital computer to upload Outlook data files, email folders, litigation folders, Vanguard files and folders.  She then deleted those items from Hospital computer systems.  In conjunction with

his resignation, Smith also deleted computer files and folders, including all of his email dating back to August of 2019, bank statements, ownership files, distribution files and payments made in 2019.   Duick, Smith and Heismeyer also removed Hospital documents, including prior employment agreements, signed deferred compensation agreements and Vanguard account statements, from their personnel files.

Smith and Heismeyer have possession, custody and control of the information and data to show the use of United States Mail and interstate wire communications and transfers.   During August of 2020, the Management Committee discovered the severance benefit payments to Smith and Heismeyer.   The Management Committee initiated a formal investigation which disclosed unauthorized compensation to Duick, Smith and Heismeyer between 2015 and 2020.   Since 2015, Duick, Smith and Heismeyer took undisclosed and unauthorized compensation in the amount of $5,908,248.45, transferred $1,979,999 to the Vanguard account and caused financial losses to the Hospital of $4,451,529.80 by returning CARES Act proceeds without the knowledge or authority of the Management Committee.

On April 29, 2021, the Hospital filed suit against Smith and Heismeyer.   As noted, plaintiff alleges the following claims: (1) violations of the Racketeer-Influenced And Corruption Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. and (2) breach of fiduciary duty.

## Analysis

Defendants argue that under RICO, the Court must dismiss all of plaintiff's claims for damages prior to April 29, 2017 because they are time-barred.   Further, defendants argue that the Court should dismiss plaintiff's breach of fiduciary duty claim because defendants did not owe plaintiff a fiduciary duty.   They also argue that even if they did owe plaintiff a fiduciary duty, the

Court should dismiss all damage claims that accrued before April 29, 2019 because they are time-barred.

## I.    RICO

Defendants argue that any claim for damages that accrued before April 29, 2017 is time-barred.  Plaintiff alleges that defendants fraudulently concealed their misconduct by diverting funds from the Hospital through undisclosed and unauthorized bonuses, deferred compensation benefits and severance benefits from 2015 through 2020, and that their fraud tolled the statute of limitations until the Management Committee discovered the injury.

To bring a civil RICO claim, plaintiff must allege that it was "injured in his business or property" by the RICO violation.  Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).  A RICO violation requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  Dummar v. Lummis, 543 F.3d 614, 620–21 (10th Cir. 2008).  A RICO "injury" is the "harm from the predicate acts that constitute racketeering activity."  Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer, 764 F.3d 1268, 1277 (10th Cir. 2014).

The statute of limitations for civil RICO claims is four years, which runs from either the discovery of the injury (the injury-discovery rule) or the date when the injury occurred, regardless whether plaintiff was aware of the injury (the injury-occurrence rule).  See Dummar, 543 F.3d at 621.  The Tenth Circuit has not adopted either rule, but almost every other circuit currently applies some form of the injury-discovery rule.  Kirchhefer, 764 F.3d at 1276.  Under the injury-discovery rule, "the injury is deemed to be discovered when, in the exercise of reasonable diligence, it could have been discovered."  Id. at 1275 (internal quotation marks omitted). The rule applies "only in the exceptional case where a reasonably diligent plaintiff could not immediately know of the injury and the cause."  Id. at 1276 (internal quotation marks omitted).  The clock starts

when "the plaintiff either has actual or inquiry notice of the injury." Id. at 1280.  The reasonably diligent plaintiff "standard is an objective one." Id. at 1281.  Under that standard, "[a] plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable plaintiff of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury." Id. at 1280 (brackets and internal quotation marks omitted).  To be on notice of the potential of fraud, plaintiff need not discover all elements of defendants' fraudulent scheme.  Id.  Under the injury-occurrence rule, on the other hand, the time of discovery is irrelevant.  Klehr v. A.O. Smith Corp., 521 U.S. 179, 198 (1997).

Most circuits apply the injury-discovery rule because "federal courts . . . generally apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is here." Kirchhefer, 764 F.3d at 1276.  Because almost every circuit has adopted the injury-discovery rule and defendant does not present any argument or cite any case which advocates for the injury-occurrence rule, we apply it here.  Plaintiff alleges that defendants used fraudulent means to conceal their activity.  Plaintiff has clearly pled sufficient facts that defendant used fraudulent means to successfully conceal the movement and payment of Hospital funds to Duick, Smith and Heismeyer, and that it did not know and prior to August of 2020, by the exercise of due diligence could not have known that it had a cause of action.  Therefore, we decline to dismiss claims for damages prior to April 29, 2017 on grounds that they are time-barred.

## II.    Breach Of Fiduciary Duty

Defendants argue that the Court should dismiss plaintiff's breach of fiduciary duty claim because as a matter of law, defendants did not owe plaintiff a fiduciary duty.  They also argue that even if they owed plaintiff a fiduciary duty, the Court should dismiss all damages claims that accrued before April 29, 2019 because they are time-barred.

-17-

A.      Fiduciary Duty

To prove a breach of a fiduciary relationship, plaintiff must show (1) a fiduciary relationship between plaintiff and defendants, (2) defendants had a duty to plaintiff based on the fiduciary relationship and (3) defendants breached their duty.  Peterson ex rel. Peterson v. Cmty. Living Opportunities, Inc., 197 P.3d 905 (Kan. Ct. App. 2008).  Under Kansas law, fiduciary relationships are one of two types: (1) those created specifically by a contract or legal proceeding and (2) those implied in law due to the factual situation surrounding the involved transactions, the relationship of the parties to each other and the questioned transactions. Denison State Bank v. Madeira, 230 Kan. 684, 691, 640 P.2d 1235, 1241 (1982).

Whether an implied confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case.  Id.  "[T]here must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, . . . business intelligence, knowledge of the facts involved, or other conditions, giving to one advantage over the other."  Ritchie Enterprises v. Honeywell Bull, Inc., 730 F. Supp. 1041, 1053 (D. Kan. 1990).  A fiduciary relationship requires "confidence reposed on one side and resulting domination and influence on the other," and a fiduciary is defined as "a person with a duty to act primarily for the benefit of another."  Swimwear Sol., Inc. v. Orlando Bathing Suit, LLC, 309 F. Supp. 3d 1022, 1033 (D. Kan. 2018).  Under Kansas law, the conscious assumption of the alleged fiduciary duty is a mandatory element.  Rajala v. Allied Corp., 919 F.2d 610, 615 (10th Cir. 1990).

Defendants argue that neither the Hospital Operating Agreement nor any other contract created the positions of fiduciaries or fiduciary duties for a CFO or COO.  Defendants argue that merely alleging that they were LLC officers does not plead the existence of a fiduciary duty, and that neither the Operating Agreement nor the Employment Agreements explicitly created fiduciary

duties between plaintiff and defendants.[3]   Plaintiff argues that the Court should imply a fiduciary duty between it and defendants, because a fiduciary relationship can be created from the facts and circumstances surrounding "the relationship of the parties to each other."   Denison State Bank, 230 Kan. at 691.

Under Kansas law, the operating agreement controls.   K.S.A. § 17-76,134(b) ("It is the policy of this act to give the maximum effect to the freedom of contract and to the enforceability of operating agreements.").   The statute also states that "[t]o the extent that, at law or in equity, a member or manager or other person has duties, including fiduciary duties, to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by an operating agreement, the member's or manager's or other person's [fiduciary] duties may be expanded or restricted or eliminated by provisions in the operating agreement, except that the operating agreement may not eliminate the implied contractual covenant of good faith and fair dealing."   K.S.A. § 17-76,134(c).

The Operating Agreement did not name the positions of COO and CFO, but Section 5.7 gave the Management Committee the power to elect necessary officers.   The Employment Agreement stated that defendants agreed to "devote all of [their] time and efforts to the performance of [their] duties as [Chief Operating Officer or Chief Financial Officer] of the Employer and to the performance of such other duties consistent with his executive status as are

---

[3]      Defendants also argue that plaintiff does not allege that either defendant was elected an officer in accordance with Section 5.7 of the Operating Agreement and therefore they are employees and do not have fiduciary duties.  Section 5.7 provides as follows: "[T]he Management Committee shall elect a Chief Executive Officer, a Management Committee Chairman and a President of the Company.  The Management Committee may also elect one or more other officers or assistant officers as it may from time to time deem necessary."  Plaintiff does not allege the method by which it appointed defendants to their positions and therefore those facts cannot be considered for the purposes of a motion to dismiss.  Gee v. Pacheco, 627 F.3d 1178, 1186 (10th Cir. 2010).

assigned to him."  Consequently, one could reasonably infer that defendants had "a duty to act primarily for the benefit of [plaintiff]."  Swimwear Sol., Inc., 309 F. Supp. 3d at 1033.  Further, in the context of acquiring confidential skills and knowledge about the Hospital, the employment agreements stated that defendants would "occupy a position of trust and confidence with respect to Employer's affairs."  This provision reposed confidence in defendants, an earmark of a fiduciary relationship.

Given the relationship of the parties and the nature of the transactions in question, along with defendants' business intelligence and knowledge of Hospital affairs, plaintiff is entitled to the benefit of a favorable inference that defendants consciously assumed fiduciary duties to plaintiff. The Court overrules defendant's motion to dismiss for failure to state a claim of breach of fiduciary duty.

B.     Statute of Limitations

Defendants argue that even if they owed fiduciary duties to plaintiff, the Court should dismiss all damages claims that accrued before April 29, 2019 because they are time-barred.  The statute of limitations for breach of fiduciary duty is two years.  K.S.A. § 60-513(a)(4); Mynatt v. Collis, 274 Kan. 850, 866, 57 P.3d 513 (2002).  A cause of action for breach of fiduciary duty accrues when the "act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party."  K.S.A. § 60-513(b).  The term "reasonably ascertainable" suggests an objective standard based upon an examination of the surrounding circumstances.  P.W.P. v. L.S., 266 Kan. 417, 425, 969 P.2d 896 (1998).  Plaintiff's claim is not "reasonably ascertainable" until it is clear that plaintiff had "knowledge of his or her injury and that the defendant was the likely cause."

Michaelis v. Farrell, 48 Kan. App. 2d 624, 631, 296 P.3d 439, 445 (2013).  Further, when a fiduciary relationship exists and defendants' silence prevents plaintiff from discovering the claim, the statute of limitations may be tolled.  Doe v. Popravak, 55 Kan. App. 2d 1, 16, 421 P.3d 760, 770 (2017).

Plaintiff argues that its claim was not "reasonably ascertainable" until August of 2020 because before then, the Management Committee had no knowledge or reason to know of defendants' activities, and defendants lied and concealed their activities.  As noted above, plaintiff has pled sufficient facts that defendants had fiduciary duties to plaintiff.  Plaintiff also alleges that defendants actively concealed and failed to disclose unauthorized payments and compensation agreements to the Management Committee, in disregard of their fiduciary duties to plaintiff, so that the statute of limitations was tolled.  Popravak, 55 Kan. App. 2d at 16.  Plaintiff has pled sufficient facts that its claim for breach of fiduciary duty was not reasonably ascertainable until August of 2020.  Therefore, the Court declines to dismiss claims for damages prior to April 29, 2019 on the grounds that they are time-barred.

**IT IS THEREFORE ORDERED** that Defendants' Motion To Dismiss, (Doc. #42) filed October 26, 2021 is **OVERRULED.**

Dated this 17th day of February, 2022 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge